# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| WILLIAM THOMAS CANIFF; ARIE BOS; BERKLEY CAPITAL MANAGEMENT, LLC; BBOT 1, LP; and BERKLEY II, L.P., | )<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

Case No. 19-cv-2935

Judge Robert M. Dow, Jr.

## MEMORANDUM OPINION AND ORDER

The Commodity Futures Trading Commission ("CFTC") brings suit against Defendants William Thomas Caniff ("Caniff"), Arie Bos ("Bos"), Berkley Capital Management, LLC ("BCM"), BBOT 1, LP ("BBOT"), and Berkley II, LP ("Berkley II") for alleged violations of the Commodity Exchange Act ("CEA"). Currently before the Court is Defendant Bos's motion to dismiss pursuant to Rules 12(b)(2), 12(b)(5), and 12(b)(6) of the Federal Rules of Civil Procedure [39]. For the following reasons, Bos's motion to dismiss [39] is denied. This case is set for status hearing on March 9, 2020 at 9:30 a.m.

**I.    Background**

The CFTC is an independent federal regulatory agency charged with the administration and enforcement of the CEA and regulations promulgated under the statute. In this suit, the CFTC alleges that Defendants engaged in a scheme to defraud investors in pool accounts to trade "binary options." Binary options involve a variety of underlying assets, including currency pairs (e.g., EUR/USD); commodities such as oil, wheat, coffee, and gold; equity indices (e.g., the Dow Jones

Industrial Index); and stocks (e.g., Coke, Google, etc.). Unlike other types of options, a binary option does not give the holder the right to purchase or sell the underlying asset. Instead, binary options are "cash settled." When the binary option expires, if the customer has correctly predicted the asset's movement, the customer is "in the money" and entitled to a payout of a pre-determined amount of money. There are three designated contract markets currently authorized to offer binary options that are commodity options transactions to retail customers in the United States: Cantor Exchange LP, Chicago Mercantile Exchange, Inc., and the North American Derivatives Exchange, Inc. ("NADEX"). This case involves transactions on NADEX, which is located in Chicago, Illinois.

Defendant Caniff is a resident of Ohio. He was convicted of several felony offenses for financial crimes committed in the 1990s. When Caniff opened a binary options trading account with NADEX in June 2016, he falsely represented that he had never been convicted of any felonies, fraudulent conversion, forgery, or theft. Defendant Bos is a resident of the Netherlands.

In January 2016, Caniff and Bos formed an "investment and trading technology firm" called BCM to offer individual participants the opportunity to trade binary options with pools of other participants. [1] at 6. BCM became the general partner of a new investment pool fund called BBOT, which was set up as a limited partnership for this pool of participants. Caniff was the designated trader for the fund and made all financial decisions for BCM, BBOT, and Berkley II. Bos was not a signatory to any of the bank accounts used by the fund; however, Bos had online access to view the BBOT, Berkeley II and BCM bank account statements.

Bos was responsible for soliciting and reporting to participants. Bos initially solicited participants by approaching family members and friends in the Netherlands. Bos distributed an information packet to prospective participants that described Caniff as having trading experience

dating back to 2004 with a "proven track record." [1] at 7. Bos instructed prospective participants to wire their funds to the pools' various bank accounts in the United States. From February 2016 through the present, at least 62 BCM participants, two of whom were U.S. customers, paid more than $4.8 million to fund investments to trade binary options through pools in the names of BBOT or Berkley II.

However, over the life of the account, Caniff sent only two payments to NADEX—$35,000 in June 2016 and $50,000 in June 2017, for a total of $85,000. Caniff allegedly misappropriated the remainder of participant funds by sending approximately $2.3 million to repay other participants and to pay Bos and himself between $1.1 and $1.2 million each in purported fees. At the time the complaint was filed, $2.5 million was owed to fund participants.

Throughout their partnership, Caniff sent Bos emails reflecting his purported daily trading activity at NADEX, some of which included purported screen shots showing the NADEX account balance for the BCM pools. According to the complaint and as detailed below, Caniff's emails reflected "implausible" rates of return and consistently profitable trading. [1] at 9.

Bos combined the NADEX account value information that he received from Caniff with the information Bos obtained from his online access to the pools' bank accounts to calculate the pools' overall profitability and individual participants' returns. Bos inserted his profit calculations into statements sent to participants and into promotional packets of information that he prepared and distributed to prospective participants without any independent verification of these profits. For example, Bos told prospective participants:

(a) For the period January 2016 through May 2016, BCM reported monthly net return on investments ("ROIs") of 3.9%, 17.3%, 23%, 11.6% and 17.3%;

(b) BCM's fund grew to a size of $5,500,000 by the end of calendar year 2016;

(c) BCM's average monthly ROI for 2016 was 10%;

3

(d) Berkley II had an ROI of 14.4% in April 2018; and

(e) Berkley II had an overall average monthly return on invested capital of 13.9% between August 2017 and April 2018.

[1] at 9-10.

The complaint alleges that all of these representations were false because:

(a) BCM's reported monthly profits for the period from January to May 2016 were false in that BBOT's account at NADEX was not opened and funded until June 29, 2016;

(b) BCM's fund did not have a value of $5,5000,000 by the end of 2016; rather, the BBOT account value combined with balances in BBOT's bank account was $277,961.89 at December 31, 2016;

(c) BCM did not average a 10% ROI for 2016; rather the average ROI for 2016 was a negative, specifically -0.88%;

(d) Berkley II did not have an ROI of 14.4% in April 2018 because BCM never opened an account at NADEX for Berkley II and, thus, there were no profits earned for this pool; and

(e) Berkley II did not have an overall average monthly return on invested capital of 13.9% between August 2017 and April 2018 because BCM never opened an account at NADEX for Berkley II and, thus, there were no profits earned for this pool.

[1] at 10.

The complaint further alleges that Bos sent false account statements to at least one participant. Participant M.Y. is a U.S. citizen who invested $100,000 with BBOT in January 2017. From January 2017 through July 2018, Bos prepared and sent M.Y. multiple "Individual Account Statements" that allegedly falsely reported profits or neglected to report losses incurred in her account at BBOT, and never reported a losing month of trading. For example, an account statement dated August 10, 2018 indicated that participant M.Y.'s $100,000 investment had increased to $146,035.21 by July 31, 2018. In fact, between January 2017 and July 2018, the

BBOT pool actually lost a net total of $40,569. Similarly, in the months of August and September 2017, Bos reported a 0% ROI to M.Y. when, in fact, the BBOT pool actually had an ROI for those months of -31.06% and -23.13%.

In early 2017, Bos made several requests for Caniff to distribute funds from the NADEX account, which Caniff claimed contained over $5 million. Caniff informed Bos that he was not able to withdraw funds from NADEX and indicated that NADEX was wrongfully holding the pools' funds. In May 2017, Bos informed M.Y. that BBOT had suspended trading because of problems that had been encountered with NADEX. Although no fees were being earned from trading during this time, Bos knew that funds continued to be withdrawn from the BBOT pool bank account during this period, and that the funds were being used to pay fees to Caniff and himself and to repay some investors. Nonetheless, Bos failed to report those expenses as deductions from the participant's account value and continued to report unchanged balances to M.Y. on her account statement.

In June 2017, Caniff told Bos that he had initiated a lawsuit in Chicago on behalf of BBOT against NADEX's bank claiming that NADEX was illegally withholding BBOT's funds. In reality, Caniff never filed a lawsuit. Rather, Caniff sent Bos fabricated pleadings and forged correspondence from an attorney purportedly representing BBOT in the dispute with NADEX. After being informed of the purported lawsuit, Bos continued to solicit individuals to invest new monies to be sent to NADEX for trading.

More than a year later, in September 2018, Bos contacted NADEX directly and learned that the balance of the trading account was only $6,824.00. Bos eventually told participant M.Y. that Caniff had reported incorrect NADEX trading results and that the total remaining participant

5

funds were significantly less than participants' overall deposits.  Participant M.Y. lost her entire investment of $100,000.

On February 1, 2019, Bos filed suit against Caniff in Illinois state court (Cook County Circuit Court Case No. 2019 CH 01264), alleging that Caniff had engaged in fraud and seeking to prevent a bank's disbursement of $116,153.25 on deposit in accounts it held in the names of BCM, BBOT and Berkley II.  On February 11, 2019, the Circuit Court entered a TRO freezing the accounts pending further order of the court.  However, on April 24, 2019, the court issued an order vacating the asset freeze.

The complaint alleges that Bos "willfully or recklessly ignored red flags that should have prompted him to seek some corroboration of BCM's incredible pool returns at NADEX," and committed fraud by failing to seek corroboration and by "distributing the absurd profit figures to existing participants and using them to solicit new participants."  [1] at 11.  Specifically, the complaint alleges that Bos ignored the following "red flags":

> (a) Bos knew that, in 2016, participants had invested total capital of $1.74 million. In or around January 2017, Caniff gave Bos a copy of a purported NADEX IRS Form 1099 showing that BBOT's total invested capital of $1.8 million had made total profits in 2016 of $5,043,386.60.
>
> (b) When Bos told Caniff to withdraw a "substantial part" of the more than $5 million in profits from NADEX in January 2017 and return them to the BBOT bank account, Caniff told Bos that the funds could not be withdrawn from NADEX and gave Bos a number of transparently bogus explanations.
>
> (c) In March 2017, Bos requested that Caniff arrange for him to have online access to personally view the NADEX account balances. Caniff said that such arrangements could not be made.
>
> (d) Bos routinely accessed the pools' bank account statements and, thus, he knew that they had only deposited a total of $85,000 with NADEX over the life of the NADEX accounts.  Yet, Bos accepted the patently absurd rate of return on a statement dated May 2, 2017 sent to him by Caniff showing that the BBOT account at NADEX had earned a balance in excess of $11.8 million through the trading of participants' funds.

6

> (e) In June 2017, Caniff falsely told Bos that he had initiated a lawsuit on behalf of BBOT against NADEX's bank claiming that NADEX was illegally withholding BBOT's funds.

[1] at 11.

The complaint alleges that by virtue of the conduct described above, Defendants have engaged, are engaging in, or are about to engage in acts and practices that violate Section 4c(b) of the CEA, 7 U.S.C.§ 6c(b), and 17 C.F.R. § 32.4, which prohibit fraud in connection with commodity options transactions. Specifically, Section 4c(b) of the CEA, 7 U.S.C. § 6c(b), makes it unlawful for any person to, among other things, offer or enter into any transaction involving any commodity regulated under the CEA which is of the character of an "option" contrary to any rules, regulations, or orders of the CFTC. 17 C.F.R. § 32.4 provides that:

> In or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction, it shall be unlawful for any person directly or indirectly:
>
> (a) To cheat or defraud or attempt to cheat or defraud any other person;
>
> (b) To make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof; or
>
> (c) To deceive or attempt to deceive any other person by any means whatsoever.

The complaint also alleges that Caniff violated Section 9(a)(4) of the CEA, 7 U.S.C. § 13(a)(4), which prohibits making false statements to a registered entity. The CFTC brings this suit pursuant to 7 U.S.C. § 13a-1 to enjoin Defendants' allegedly unlawful acts and practices and compel them to comply with the CEA and regulations promulgated thereunder. The CFTC also seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, and pre- and post-judgment interest.

On June 14, 2019, the CFTC filed a motion for an order directing service of summons and the complaint on Bos by alternative means [28]. The CFTC represented that it had initially attempted to serve Bos by requesting acceptance of service from attorney Michelle LaGrotta, who had represented Bos "in months of negotiations with the [CFTC] before the filing of this lawsuit and for Bos in contemporaneous and related state court litigation." *Id*. at 1. LaGrotta refused to accept service because she was not retained to represent Bos in this lawsuit. See *id*. at 2. The CFTC nonetheless has served LaGrotta with copies of the summons, complaint, and all docket entries in this matter. The CFTC has also sent copies of the same to an email address which the CFTC had used to exchange emails with Bos before it filed this lawsuit. Bos did not respond to the emails, but the CFTC received emails acknowledgements that two of the four emails it sent to Bos were "read" by him. *Id*. The CFTC explained that it sought to avoid serving Bos under the Hague Convention, because it would "cost thousands of dollars and take months to perfect service," and also would require the translation of documents into Dutch, even though Bos "reads and understands English as demonstrated by his past phone and email communications with representatives of the [CFTC] as well as in-person and email communications with at least one U.S. investor." *Id*. The CFTC sought an order approving the use of email to service process on Bos, or alternatively an order permitting service on LaGrotta. On June 24, 2019, the Court granted the CFTC's motion [31]. The Court determined that service upon Bos had been made as of June 19, 2019 by serving Bos via email and through LaGrotta.

Currently before the Court is Bos' motion to dismiss the complaint pursuant to Rules 12(b)(2), 12(b)(5), and 12(b)(6) of the Federal Rules of Civil Procedure [39].

## II. Sufficiency of Service

The Court first considers Bos' threshold argument that he was not properly served with process. Bos argues in his motion to dismiss (but appears to have abandoned the argument by his reply brief) that it was improper for the CFTC to seek authorization to serve the complaint by alternative means under Rule 4(f)(3), because the CFTC did not first attempt service pursuant to the Hague Convention under Rule 4(f)(1) and improperly used Rule 4(f)(3) to serve the complaint on Bos via email. The CFTC bears the burden of proving that Bos was properly served. See *Cardenas v. City of Chicago*, 646 F.3d 1001, 1005 (7th Cir. 2011).

Bos' motion to dismiss based on insufficiency of service is denied. An individual in a foreign country may be served "by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents" ("Convention"), Fed. R. Civ. P. 4(f)(1), *or* "by other means not prohibited by international agreement, as the court orders," Fed. R. Civ. P. 4(f)(3). The plain language of the rule does not require a plaintiff to attempt service under Rule 4(f)(1) before seeking authorization to use an alternative means of service under Rule 4(f)(3). See *Monco v. Zoltek Corp.*, 2018 WL 3190817, at *4 (N.D. Ill. Apr. 24, 2018) (explaining that a plaintiff "is not required to first attempt service through the Hague Convention under Rule 4(f)(1) before asking this Court to allow alternate means"); see also *AngioDynamics, Inc. v. Biolitec, AG*, 780 F.3d 420, 429 (1st Cir. 2015) ("By its plain terms, Rule 4(f)(3) does not require exhaustion of all possible methods of service before a court may authorize service by 'other means,' such as service through counsel and by email."); *Enovative Techs., LLC v. Leor*, 622 Fed. Appx. 212, 214 (4th Cir. 2015) ("Rule 4(f)(3) does not denote any hierarchy or preference for one method of service over another."); *Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1015 (9th Cir. 2002) ("court-

directed service under Rule 4(f)(3) is as favored as service available under Rule 4(f)(1) or Rule 4(f)(2)"); *Bazarian Int'l Fin. Assocs., L.L.C. v. Desarrollos Aerohotelco, C.A.*, 168 F. Supp. 3d 1, 16 (Dist. D.C. 2016) (holding that a "plaintiff is not required to first demonstrate a minimum threshold effort to serve Defendants via ... the Hague Convention" before proceeding under Rule 4(f)(3)).

Nonetheless, the Court is cognizant of the Supreme Court's statement in *Water Splash, Inc. v. Menon*, 137 S. Ct. 1504 (U.S. 2017), that the Convention "specifies certain approved methods of service and 'pre-empts inconsistent methods of service' wherever it applies." *Id*. at 1507. In *Water Splash*, the Court addressed whether service by mail in Canada was permitted under the Convention. The Court explained that service by mail, though not affirmatively authorized by the Convention, was "permissible" and not preempted "if two conditions are met: first, the receiving state has not objected to service by mail; and second, service by mail is authorized under otherwise-applicable law." *Id*. at 1513. The Court determined that Canada did not object to service by postal channels, as provided for in Article 10 of the Convention, and remanded the case to the Texas state court for a determination of whether Texas law authorized the methods of service used by the plaintiff. *Id*.

This Court will apply the same analysis to service by email. The Convention does not affirmatively authorize, nor does it prohibit, service by email. See *Luxottica Group S.p.A. v. Partnerships & Unincorporated Ass'ns Identified on Schedule "A"*, 391 F. Supp. 3d 816, 822 (N.D. Ill. 2019) ("The Convention … does not speak directly to service by email and other electronic means."); *Habas Sinai Ve Tibbi Gazlar Istihsal A.S. v. Int'l Tech. & Knowledge Co.*, 2019 WL 7049504, at *3 (W.D. Pa. Dec. 23, 2019) (same); *Bazarian Int'l Fin. Assocs.*, 168 F. Supp. 3d at 17 (same). There is no indication from the parties' briefs (or the Court's own research)

that the Netherlands has stated any specific objection to service by email or, more generally, that it has not consented to the means of service listed in Article 10 of the Convention. The CFTC also cites to a table from the Hague Conference on Private International Law showing that the Netherlands does not object to service under Article 10. See [45] at 19 (citing Table Reflecting Applicability of Articles 8(2), 10(a)(b) and (c), 15(2) and 16(3) of the Hague Service Convention, (Feb. 2019), https://assets.hcch.net/docs/6365f76b-22b3-4bac82ea-395bf75b2254.pdf (last visited Feb. 25, 2020)). This stands in contrast to *Luxottica* and *Habas Sinai*, where service via email on residents of China and Turkey, respectively, was deemed insufficient due to those countries' objections to Article 10 service through postal channels. See *Luxottica*, 391 F. Supp. 3d at 827; *Habas Sinai*, 2019 WL 7049504, at *3.

Finally, in this case service by email was authorized under Rule 4(f)(3) because Plaintiff properly obtained permission from the Court to use alternative means of service. The method approved by the Court (email to Bos at an address the CFTC had previously used to contact him, along with service on Bos' American counsel) was reasonably calculated to give notice of the lawsuit to Plaintiff, and his appearance in court demonstrates that the method was effective. See, e.g., *CFTC v. Aliaga, et al.*, 272 F.R.D. 617, 620-21 (S.D. Fla. 2011) (service upon individual defendant and corporate defendant located in Dominican Republic via email and through service on local United States counsel was reasonably calculated to apprise defendants of pendency of action for injunctive and civil monetary penalties brought against them by the CFTC); see also *Tann, et al. v. Thecheap Name*, 2019 WL 4060337, at *1 (D. Nev. Aug. 28, 2019) (authorizing service by email on foreign defendant pursuant to Rule 4(f)(3), where such service was "reasonably calculated, under the circumstances of this case, to apprise Defendant of the pendency of the action and afford it an opportunity to present objections").

Therefore, Plaintiff's motion to dismiss is denied to the extent it is based on insufficiency of service under Rule 12(b)(5) and lack of personal jurisdiction under Rule 12(b)(2).

## III. Sufficiency of the Complaint

### A. Legal Standard

Bos also moves to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to adequately allege that he acted with the requisite scienter to violate the CEA. For purposes of a motion to dismiss under Rule 12(b)(6), the Court "'accept[s] as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff.'" *Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2018) (quoting *Kubiak v. City of Chicago*, 810 F.3d 476, 480-81 (7th Cir. 2016)). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must allege facts which, when taken as true, "'plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level.'" *Cochran v. Illinois State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (quoting *EEOC v. Concentra Health Servs.*, 496 F.3d 773, 776 (7th Cir. 2007)). The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011). In addition, it is proper for the Court to "consider, in addition to the allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013) (citing *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir.2012)); see also Fed. R. Civ. P. 10(c). Further, although it is well established that a "complaint may not be amended by the briefs in opposition to a motion to dismiss," *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 348 (7th Cir. 2012), the Court may "consider additional facts set forth in" a brief opposing dismissal "so long as those facts are

consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013) (quoting *Geinosky*, 675 F.3d at 745 n.1); see also *In re Dealer Management Systems Antitrust Litigation*, 313 F. Supp. 3d 931, 938–39 (N.D. Ill. 2018) (collecting cases).

The CFTC's claim for violation of the CEA sounds in fraud and therefore is subject to the heightened federal pleading standard of Rule 9(b). Rule 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). While "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," *id.*, "there must still be 'some basis for believing the plaintiff could prove scienter.'" *S.E.C. v. Steffes*, 805 F. Supp. 2d 601, 618 (N.D. Ill. 2011) (quoting *Mason v. Medline Industries, Inc.*, 731 F. Supp. 2d 730, 740 (N.D. Ill. 2010)). In other words, "the pleadings must allege sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind." *Id.* (quoting *Triteq Lock & Sec. LLC v. HMC Holdings LLC*, 2011 WL 2648592, at *4 (N.D. Ill. July 5, 2011)). The Court "consider[s] the 'complaint in its entirety' to determine 'whether *all* of the facts alleged, taken collectively' meet the *scienter* standard." *Id.* at 617 n.13 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007)).

The CFTC, like the Securities Exchange Commission ("SEC"), is a federal agency charged with protecting the investing public and therefore is not subject to the heightened "state of mind" pleading standard for private plaintiffs who are subject to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(2). See *Steffes*, 805 F. Supp. 2d at 616-17 (collecting cases). Thus, contrary to Bos' contention otherwise, the CFTC is not required "to 'plead facts rendering an inference of scienter at least as likely as any plausible opposing inference.'" [40] at 7 (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008)).

**B.     Analysis**

To establish that Bos violated 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4 by fraudulently soliciting and reporting to participants, the CFTC must prove that (a) Bos made a misrepresentation, misleading statement, or a deceptive omission; (b) acted with scienter; and (c) the misrepresentation or omission is material. *CFTC v. R.J. Fitzgerald & Co., Inc.*, 310 F. 3d 1321, 1328 (11th Cir. 2002); see also *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 226 (E.D.N.Y. 2018); *CFTC v. Sterling Trading Group, Inc.*, 605 F. Supp. 2d 1245, 1351 (S.D. Fla. 2009); *CFTC v. Reisinger*, 2014 WL 4922432, at *9 (N.D. Ill., Sept. 30, 2014).

Bos challenges the sufficiency of the CFTC's allegations supporting scienter. "The scienter element requires proof that the defendant 'either knew the statement was false or was reckless in disregarding a substantial risk that it was false.'" *Reisinger*, 2014 WL 4922432, at *10 (quoting *Makor*, 513 F.3d at 704). "Recklessness in this context means 'an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id*. (quoting *Makor*, 513 F.3d at 704); see also *S.E.C. v. Bauer*, 723 F. 3d 758, 775 (7th Cir 2013) (securities fraud); *CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1015 (N.D. Ill. 2015) (fraud by manipulative conduct in violation of the CEA).

Bos' position is that the complaint, viewed as a whole, reflects that he "was not a part of Caniff's scheme to defraud investors," but instead "was a part of the group Caniff sought to defraud." [40] at 5. Bos emphasizes that Caniff "repeatedly lied to Bos about [his] investing activities, misrepresented critical aspects of [his] purported investment activities, and produced forged documents—including bank statements, NADEX account balances, IRS forms, and lawsuits," which prevented Bos from discovering the alleged fraud. *Id*. at 5-6. The Court agrees

that one inference that might be drawn from the facts alleged in the complaint is that Bos did not know about Caniff's scheme and could not have uncovered it earlier due to Caniff's extensive attempts to cover up his actions. However, as the CFTC has persuasively pled and argued, this is not the only inference that could be drawn from the facts. Viewing the complaint and drawing all inferences in favor of the CFTC—as the Court must do in considering a motion to dismiss under Rule 12(b)(6), see *Calderon-Ramirez*, 877 F.3d at 275—the Court concludes that the CFTC has adequately alleged scienter.

The complaint identifies multiple "red flags" that, in the CFTC's view, "should have prompted [Bos] to seek some corroboration of BCM's incredible pool returns at NADEX." [1] at 11. The Court finds most noteworthy the alleged fact that "Bos routinely accessed the pools' bank account statements and, thus, he knew that they had only deposited a total of $85,000 with NADEX over the life of the NADEX accounts," yet Bos did not question "a statement dated May 2, 2017 sent to him by Caniff showing that the BBOT account at NADEX had earned a balance in excess of *$11.8 million* through the trading of participants' funds." *Id.* (emphasis added). Instead, Bos distributed the profit report to pool participants and continued to solicit more investments based on those purported profits.

Bos argues that this does not support an inference that he disregarded a substantial risk that these reported profits were false, because "Caniff switched between three different banks over a seventeen month period between February 2016 and July 2017," which Bos characterizes as a likely "attempt to obfuscate transactions with Caniff's NADEX account." [40] at 9-10. However, the changes in bank accounts identified in the complaint, see [1] at 7, are not so frequent or complicated that it is apparent from the pleadings that Bos' apparent failure to keep track of what funds actually went to NADEX constituted mere negligence, rather than an "extreme departure

15

from the standards of ordinary care." *Reisinger*, 2014 WL 4922432, at *9. This is true especially in light of Caniff's suspicious behavior in the months leading up to the May 2017 statement of substantial profits, including Caniff's statement in January 2017 that funds could not be withdrawn from NADEX and his statement in March 2017 that is would be impossible to arrange for Bos to have online access to personally view the NADEX account balances. Further, as the CFTC points out, when a defendant, like Bos, "plays a central role in marketing an investment, his defense that he was unaware that the investment was a fraud" may be viewed as less credible. S.*E.C. v. Milan Capital Grp., Inc.*, 2000 WL 1682761, at *5 (S.D.N.Y. Nov. 9, 2000) (citing *S.E.C. v. Infinity Group Company*, 993 F. Supp. 324, 330 (E.D. Pa. 1998).; see also S.*E.C. v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421, 449 & n.31 (E.D.N.Y. 2016) (holding that promotors of a pyramid scheme who recruited investors with false promises of investment returns acted recklessly after doing nothing to evaluate the legitimacy of the investment, besides conferring with another promoter, after being confronted with obvious signs investment was a fraud).

The Court also finds significant the complaint's allegation that, although he informed pool participant M.Y. by May 2017 that BBOT had suspended trading because of problems that had been encountered with NADEX and was told by Caniff in June 2017 that a lawsuit had been initiated against NADEX for illegally withholding funds, Bos continued to solicit investments and collect fees. It was September 2018 before Bos finally contacted NADEX directly and learned that there was only $6,824.00 in the trading account. Bos characterizes all of his actions as reasonable in light of Caniff's extensive attempts to cover his illegal activity. In particular, Bos argues that Caniff used the fake lawsuit to force Bos to channel his communications to NADEX through Caniff and his attorney. While that is one conclusion a factfinder might plausibly reach based on the allegations of the complaint, another plausible conclusion is that Bos' behavior

16

constituted an extreme departure from the standards of ordinary care. Further, Bos does not explain why he finally decided to context NADEX directly in September 2018, if he really believed that he was somehow prohibited from doing so based on the pendency of the lawsuit. Compare *S.E.C. v. George*, 426 F. 3d 786, 795 (6th Cir. 2005) (affirming summary judgment against defendant for fraud, where defendant had solicited money for what turned out to be a Ponzi scheme, and who also gave reports to investors based on information received from third parties which he had not verified, when he "failed to verify the legitimacy of the investment programs he advertised"); *Gebhart v. S.E.C.*, 595 F. 3d 1034, 1043 (9th Cir. 2010) (holding that securities salespersons acted with scienter by recklessly making false statements and concluding that there was "objective unreasonableness" in defendants' conduct where they made no effort to investigate or corroborate false representations that they repeated when soliciting investment clients); *Lewis v. Straka*, 535 F. Supp. 2d 926, 931 (E.D. Wis. 2008) (complaint sufficiently alleged scienter of company president who made untruthful statements in private placement memoranda where facts alleges supported inference that he had "recklessly turned a blind eye to the financial health" of his company and its subsidiaries "but, in order to buy time to fix the problem, opted not to initially disclose the truth").

Bos also argues that allegations of scienter are lacking because the complaint "fails to show what Bos would have gained from ignoring or covering up Caniff's fraud." [40] at 11. Yet in the same sentence, Bos acknowledges that the complaint "alleges Bos received payouts Caniff identified as fees." *Id.* Bos also argues that the CFTC fails to "provide any allegation indicating what Bos … had to gain from defrauding his friends and family members in the Netherlands, where Bos lives." *Id*. Again, Plaintiff sought to gain over $1 million in fees—and unfortunately would not be the first person to profit personally by defrauding friends and family.

17

In sum, the complaint, viewed as a whole, alleges sufficient facts from which the factfinder could reasonably infer that Bos recklessly disregarded a substantial risk that Caniff's representations concerning profits made on NADEX were false and continued to solicit investments based on those representations. *Reisinger*, 2014 WL 4922432, at *10. The allegations here are much more robust that those at issue in the two cases cited by Bos, *Robin v. Arthur Young & Co.*, 915 F.2d 1120 (7th Cir. 1990), and *Lewis v. Hermann*, 775 F. Supp. 1137 (N.D. Ill. 1991). In *Robin*, the Seventh Circuit upheld the dismissal of a complaint for aiding and abetting securities fraud against an accounting firm because the complaint contained only "bare allegations" that the firm "should have known that [its] prospectus was false and misleading." 915 F.2d at 1127. In *Lewis*, the court dismissed fraud claims against service providers, including a law firm that provided services to the financial advisors who were the primary violators, for lack of scienter because the complaint did not allege any facts suggesting that the service providers had any knowledge of the fraud or did anything wrong. 775 F. Supp. at 1152-53. Here, by contrast, the complaint alleges that (1) Bos was a partner with the primary violator, Caniff, and not a mere independent service provider; (2) Bos was paid more than a million dollars over the course of the scheme; and (3) Bos was an active participant in the fraud by making false representations to prospective pool participants and reports of false earnings to participants. The complaint also alleges facts that plausibly suggest that Bos acted recklessly by failing to investigate and corroborate his partner's representations and continuing to solicit participants to send money to NADEX after their firm had sued NADEX for not releasing millions of participant profits.

For these reasons, the Court concludes that the complaint has alleged sufficient facts concerning scienter and denies Bos' motion to dismiss under Rule 12(b)(6).

## IV. Conclusion

For these reasons, Bos's motion to dismiss [39] is denied. This case is set for status hearing on March 9, 2020 at 9:30 a.m.

Dated: February 27, 2020

Robert M. Dow, Jr.
United States District Judge